Margaret T. **ALLEN, et al., Plaintiffs,**

**Board of Trustees For Alabama State University, et al., Plaintiff–Intervenors,**

v.

**THE ALABAMA STATE BOARD OF EDUCATION, et al., Defendants.**

CIV.A.No. 81–T–697–N.

United States District Court, M.D. Alabama, Northern Division.

Jan. 5, 2000.

---

kins, PC, Birmingham, AL, for Margaret T. Allen, individually and on behalf of others similarly situated, plaintiffs.

David W. Long, Sandra L. Vinik, Sirote & Permutt, Birmingham, AL, for Board of Trustees for Alabama State University, Eria P. Smith, Judy P. Lockhart, Dolly M. Lavender, intervenor-plaintiffs.

David R. Boyd, Balch & Bingham, Montgomery AL, Susan McKinney, Office of the Attorney General, Montgomery, AL, defendants.

## OPINION

THOMPSON, District Judge.

This longstanding and contentious litigation, filed almost 19 years ago, charging that the State of Alabama's teacher certification test impermissibly discriminated against African–American persons seeking teacher certification, is before the court again, this time on a new and amended consent decree that the parties represent will finally bring this lawsuit to an end within ten to 15 years. For the reasons that follow, the court reluctantly approves and adopts the amended consent decree, the primary basis for the court's reluctance being that the court had hoped this litigation would end much, much sooner.

## I. BACKGROUND

In December of 1981, plaintiffs, who are three African–American teachers, filed this lawsuit challenging the Alabama State Board of Education's teacher certification testing program. This court certified a class represented by these individuals, consisting of all African–American persons who have been or will be denied teacher certification because they failed to pass certain required standardized teacher certification tests. Later, the court allowed the Board of Trustees of Alabama State University, a predominantly black university, and another black teacher to intervene as additional plaintiffs.

The plaintiffs and the class alleged that the certification tests required by the Alabama State Board of Education had an adverse racial impact on African–American students and colleges, had no relationship to job per-

Richard M. Gervase, Washington, DC, Pro se.

Terry G. Davis, Terry G. Davis, P.C., Mark Englehart, Beasley, Allen, Crow, Methvin, Portis & Miles, PC, Kenneth Lamar Thomas, Thomas, Means, Gillis, Devlin, Robinson & Seay, PC, Montgomery, AL, Fred D. Gray, Gray, Langford, Sapp, McGowan, Gray & Nathanson, Tuskegee, AL, Gregory Brent Stein, Stein & Brewster, Mobile, AL, A. Wesley Pitters, A. Wesley Pitters, PC, Montgomery, AL, Valerie L. Acoff, Thomas, Means, Gillis, Devlin, Robinson & Seay, PC, Birmingham, AL, Montgomery, AL, Donald V. Watkins, Donald V. Wat-

formance, were culturally biased, evaluated students on matters not taught in the classroom, and were implemented without adequate prior notice. After substantial discovery was done, this lawsuit was settled through a consent decree which took effect in 1987. The consent decree allowed the certification testing program to continue only in a substantially modified form.

The 1987 consent decree, as recently summarized by the Eleventh Circuit Court of Appeals, is as follows: "The decree ... provided that any future certification examinations would be fashioned by using a system designed to avoid an unjustifiable discriminatory impact on African–American teacher candidates, and specifically forbade the use of any teacher certification examination that would have a discriminatory impact on African–Americans unless that exam had been validated for teacher certification. Most importantly, the decree required the Board, in developing new tests, to follow what is known as the 'Golden Rule' methodology and provided for the creation of an independent monitoring panel to oversee the test development process." *Allen v. Alabama State Board of Education*, 164 F.3d 1347, 1349 (11th Cir. 1999). The appellate court further explained:

Under this methodology, which was named for the first case in which it was used, *Golden Rule Life Insurance Co. v. Mathias*, 86 Ill.App.3d 323, 41 Ill.Dec. 888, 408 N.E.2d 310 (1980), the Board must submit proposed questions to a large scale field-test to measure the item difficulty or 'p-value' for African–American and white candidates. The consent decree divides proposed items into three categories: Type I, where the item difficulty for African–American and white candidates differs by no more than five percent, Type II, where the p-value differential is greater than five percent but no more than ten percent, and Type III, where the p-value differential is greater than ten percent but no more than fifteen percent.

In devising any new test, the Board is to use only Type I items 'so long as they are available in sufficient numbers to provide comprehensive coverage of the objectives

sought to be measured in the examination.' Where Type I items are insufficient to create a valid exam, the consent decree allows the Board to use Type II items as well. However, if the supply of both available Type I and Type II items are insufficient to create a valid exam, the Board could also use a limited number of Type III items—no more than ten percent of the total number of items unless the monitoring panel agreed otherwise.

*Id.* at 1349 n. 1. A detailed history of this extended litigation can be found in the following additional reported decisions: *Allen v. Alabama State Board of Education*, 816 F.2d 575, 576–77 (11th Cir.1987); *Richardson v. Lamar County Bd. of Educ.*, 729 F.Supp. 806 (M.D.Ala.1989) (Thompson, J.); *Allen v. State Bd. of Educ.*, 636 F.Supp. 64 (M.D.Ala. 1986) (Thompson, J.); *Allen v. State Bd. of Educ.*, 612 F.Supp. 1046 (M.D.Ala.1985) (Thompson, J.).

After the 1987 consent decree became effective, the State Board notified the court that it would continue testing teacher candidates under the provisions of the consent decree. However, no new test was developed or implemented, and, in July 1988, the Board notified the court that it was "suspending" the use of a test for teacher certification "due to an inability, for various reasons, of the State Board of Education to move forward with the development of the Teacher Certification Testing Program in a timely manner."

In 1995, in response to a state law requiring the State Board to review and select a nationally-normed teacher examination to be used for teacher certification, the plaintiffs filed motions for further relief and for an injunction. In addition, the defendants filed motions to modify the consent decree and to vacate the consent decree. This court issued two orders based upon the evidence submitted by the parties. In the first, the court held that the State Board had not made "a good-faith effort to develop a test that both meets the requirements of the consent decree and is psychometrically sound or even to find out whether such a test can be developed," and that, "[u]nless and until they do," their motions are essentially premature. *Al-*

*len v. Alabama State Board of Education,* 976 F.Supp. 1410, 1431 (M.D.Ala.1997) (Thompson, J.). The court therefore denied the defendants' motions to vacate or modify without prejudice to the right of the Board to seek such relief subsequently. *Id.* In the other order, this court denied the plaintiffs' motions for further relief and for injunction, relying upon the same reasons it did to deny without prejudice the defendants' motions to modify or vacate. *See Allen v. Alabama State Board of Education,* 983 F.Supp. 1084 (M.D.Ala.1997) (Thompson, J.).

The defendants appealed this court's decision refusing to vacate the 1987 consent decree. The defendants argued before the Eleventh Circuit Court of Appeals that the 1987 consent decree should have been vacated because (1) the State Board had fully complied with the decree, notwithstanding the fact that it had not implemented tests with the safeguards required by the decree, and (2) the decree contained race-conscious measures which violate the equal protection clause of the fourteenth amendment to the United States Constitution. The Eleventh Circuit affirmed, holding that this court's refusal to vacate the consent decree was not an abuse of discretion and that the consent decree's testing provisions did not violate the equal protection clause. *See Allen v. Alabama State Board of Education,* 164 F.3d 1347 (11th Cir.1999).

The defendants then filed a petition in the appellate court for rehearing en banc, presenting the same issues as they did in their appeal. It is at that point that the parties negotiated the proposed amended consent decree which is before the court for consideration.

Under the proposed amended consent decree, the State Board of Education and the State Superintendent could employ a 'basic skills competency test' for prospective teachers as an alternative to the testing procedures provided for the 1987 consent decree. This basic skills competency test will assess prospective teachers' skills in reading, writing, and mathematics. A process will be employed which will allow for the use of scores on the basic skills test and the applicant's grade point average in his or her undergraduate core curriculum as defined within the amended consent decree. Under the procedure proposed, if an applicant does not make the required cutscore on the tests, then his or her grade point average will be counted 50% and his test score counted 50% to determine certification, provided the applicant has a minimum grade point average of 2.5 on a 4.0 scale.

The basic skills test will be implemented in accordance with three underlying provisions. First, the tests must meet applicable professional guidelines. Second, the development, administration, and continued review of the tests will be monitored by a three-person expert panel, the members of which will be appointed by the court after nomination by the parties. Third, the test items will be validated and reviewed to avoid unnecessary adverse impact. Passing scores will be recommended by the monitoring committee sufficient to protect the interest of the public school children of Alabama.

For prospective teachers who meet the 2.5 grade-point-average requirement but fail to pass any portion of the basic skills test (reading, writing, or mathematics subtest), they may attend a remedial course to be developed and taught by instructors approved by the State Board of Education, consistent with recommendations of the monitoring committee. Those applicants who successfully complete the remedial course and its exit assessment will be certified to teach in Alabama.

In addition to the basic skills test referred to above, the State Board of Education and the State Superintendent will be permitted to use 'subject matter tests' specific to a candidate's intended area of certification. If the State Board and the State Superintendent use subject matter tests, the following conditions will apply: (a) subject matter tests will not be used for a period of five years after the date the proposed amended consent decree is approved by the court; (b) the essential design, development and implementation of the subject matter tests will be subject to review and approval of the expert monitoring committee referred to above; (c) if an applicant does not make the required cutscore on the subject matter tests, then his or her grade point average as determined under the

provisions of the amended consent decree will be counted 50% and his test score will be counted 50% to determine certification, provided that the applicant has a minimum grade point average of 2.5 on a 4.0 scale; and (d), for prospective teachers who meet the 2.5 grade-point-average requirement but who fail to pass the subject matter test, they may attend a remedial course to be developed and taught by instructors approved by the State Board of Education, consistent with the recommendations of the monitoring committee, and upon successful completion of the remedial course, will be certified to teach in Alabama.

The proposed amended consent decree represents a substantial change and compromise from the 1987 consent decree which is currently in effect. The 1987 consent decree, as described above, requires a review of individual test questions and an attempt to lessen the racial differences in performance on them by replacing test questions with similar questions which have less racial disparity, where possible. The proposed amended consent decree allows defendants to use the basic skills test and (after the passage of five years) subject specific tests without the same standard of racial differences in correct answers on test questions and without the opportunity to replace individual test questions with questions which have a lesser adverse racial impact.

The proposed consent decree also has a sunset provision. The decree provides that, unless extended for "good cause" by the court, it will terminate in 15 years if the defendants elect to use the new provisions for subject-matter-test certification and in ten years otherwise.

## II. NOTICE TO THE CLASS AND HEARING

Before addressing the merits of approving the amended consent decree, the court must ensure that all interested parties were informed of the amendment to the settlement and had the opportunity to voice their objections. Rule 23(e) of the Federal Rules of Civil Procedures requires that class members be notified of the settlement. Additionally, the Civil Rights Act of 1991 precludes chal-

lenges to consent decree judgments resolving employment discrimination claims from those non-class members who had actual notice of the proposed decree and a reasonable opportunity to present objections. 42 U.S.C.A. § 2000e–2(n)(1)(B).

The original definition of the class of plaintiffs in this action was as follows: "All black persons who have been or will be denied any level teaching certificate because of their failure to pass the tests administered by the Alabama Initial Teacher Certification Testing Program." That definition is somewhat dated, particularly because the "Alabama Initial Teacher Certification Testing Program" was the name of the testing program which the plaintiffs originally challenged in 1981. For present purposes, the class members who have an interest in the litigation and the proposed amended consent decree are properly designated as: "All African–Americans who may seek certification as a teacher in the state of Alabama." The parties in these proceedings directed notice to that class of persons.

Court-approved notices were published in major daily newspapers in the cities of Huntsville, Birmingham, Montgomery, Mobile, Tuscaloosa, Dothan, Decatur, and Gadsden, Alabama, twice each week, including one Sunday edition (if published) for three consecutive weeks. In addition, the court-approved notice was sent to the presidents (or chief executive officers) and deans of education of all Alabama colleges and universities that operate approved teacher-education programs, and to the presidents or chief executive officers of all Alabama Postsecondary (two-year) institutions, with requests to those officials to post and distribute notice at their respective institutions as broadly as practicable.

■ The notice was adequate to inform all interested parties about the provisions of the amended decree. Because of the amorphous nature of the class of plaintiffs here, notice by publication in major newspapers and by distribution to colleges and universities at which future teacher candidates may be attending was appropriate and reasonable. The fairness hearing and opportunity for

written objections were adequate to solicit and determine the views of class members and non-class members. In sum, the court finds that the notice and fairness hearing were sufficient under Rule 23(e) and the Civil Rights Act of 1991.

## III. STANDARDS FOR REVIEW OF CONSENT DECREES

 It is well-established that voluntary settlement is the preferred means of resolving class-action employment discrimination lawsuits.[1] *See Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). It is equally well-established, however, that the settlement process is susceptible to certain types of abuses and, as a result, a court has a heavy, independent duty to insure that the settlement is fair, adequate, and reasonable. *See Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Pettway*, 576 F.2d at 1169. For example, the interest of the class lawyer and the class may diverge, or some members of the class may wrongfully compromise or "sell-out" the interest of other class members. *Pettway*, 576 F.2d at 1169. As part of determining fairness, adequacy, and reasonableness, the court must also insure that the settlement is not collusive. *See Piambino*, 757 F.2d at 1139. Finally, the court has the duty of insuring that the settlement is not illegal or against public policy. *See United States v. City of Alexandria*, 614 F.2d 1358, 1362 (5th Cir.1980); *Harris v. Graddick*, 615 F.Supp. 239, 241–42 (M.D.Ala. 1985) (Thompson, J.).

## IV. WHETHER THE DECREE IS FAIR, ADEQUATE AND REASONABLE

 This court has previously set out the factors it will examine in deciding whether a settlement is fair, adequate, and reasonable. *See Shuford v. Alabama State Board of Edu-*cation, 897 F.Supp. 1535, 1548 (M.D.Ala. 1995) (Thompson, J.). Those factors are as follows: (1) the views of the class members; (2) the views of class counsel; (3) the substance and amount of opposition to the settlement; (4) the possible existence of collusion behind the settlement; (5) the state of the proceedings; (6) the likelihood of success at trial; (7) the complexity, expense and likely duration of the lawsuit; and (8) the range of possible recovery. *See Leverso v. South-Trust Bank of Alabama*, 18 F.3d 1527, 1530 n. 6 (11th Cir.1994); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984).

### A. Views of Class Members

In determining whether a settlement is fair, adequate and reasonable, the obvious first place a court should look is to the views of the class itself. *See Shuford*, 897 F.Supp. at 1548.

In part, because there have been no objections filed by class members, the court has no reason to suspect that the proposed amended consent decree treats any portion of the class unfairly. *See id.* at 1535. For the same reason, the court concludes that the class members are overwhelmingly in support of the proposed amendment to the consent decree. *See id.* at 1548; *cf. Reynolds v. King*, 790 F.Supp. 1101, 1109 (M.D.Ala. 1990) (Thompson, J.) (majority's silence may be, but is not always, indicative of classwide support). Moreover, there appears to be no overt conflict within the class. The great weight accorded majority opinion in this instance favors approving the amendment to the decree.

### B. Views of Class Counsel

The judgment of class counsel is also important in addressing the fairness, adequacy, and reasonableness of a consent decree. *See Pettway*, 576 F.2d at 1215. Counsel for the plaintiff class here include experienced civil rights attorneys. They represent to the court that the decree is fair, adequate, and reasonable, and the court accords their views due consideration.

---

1. The court is aware that the defendants have contended, and may still contend, that this is not technically an employment case. The court need not resolve that question, however, because the principles reviewed in the text are applicable in any event.

### C. Substance and Amount of Opposition to the Decree

In addition to no objections from class members, only one objection to the proposed amended consent decree reared its head from outside the class, and it was withdrawn at the fairness hearing.[2] Based upon the lack of objections, the court finds that the amount of opposition to the decree is negligible, if not non-existent.

### D. Existence of Collusion

There has been no allegation that the amended consent decree was a product of collusion between the parties. There is no evidence before the court that counsel or the named plaintiffs will benefit from the decree at the expense of class members. Finally, there is no evidence that the parties' negotiations were anything other than arms-length.

### E. Other Factors

The remaining four factors are interrelated: the stage of the proceedings; the likelihood of success at trial; the complexity, expense and likely duration of the lawsuit; and the range of possible recovery.

This litigation is now almost 19 years old. The parties should know well the strengths and weaknesses of their respective positions. They have also had the benefit of the court's views on testing, the interim nature of its rulings to date, and the advantages of resolving the remaining issues by settlement.

The defendants' petition for rehearing en banc presently pending in the Eleventh Circuit presents weighty issues for decision, issues which continue to evolve in our federal jurisprudence. Additionally, the court made clear it was denying the defendants' motions to modify and vacate the consent decree without prejudice and that the defendants are free to raise the questions of modification or vacatur at any appropriate time in the future. The trial on the motions was contentious and presented complex issues, and further litigation of this matter would not be different.

In light of the above considerations, the court has independently evaluated the fairness, adequacy, and reasonableness of the proposed settlement. "A settlement is in large measure a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial." *Paradise v. Wells,* 686 F.Supp. 1442, 1446 (M.D.Ala. 1988). As a result, the question is not "whether the proposed consent decree is the best possible deal," but whether it is "at a minimum, fair, adequate and reasonable." *Id.* at 1448.

The decree should be a significant benefit to the class members and to the Alabama educational system. Establishment of standards for teaching certification should benefit the school children of Alabama, and the amended decree provides safeguards for fair treatment of all candidates taking the certification test. Based on the above considerations, the proposed amendment to the consent decree is fair, adequate, and reasonable.

## V. WHETHER THE DECREE IS LEGAL AND GOOD PUBLIC POLICY

The court must also address whether the proposed amended consent decree is legal. Particularly, if a decree involves affirmative action undertaken by a public employer, it must be analyzed under both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, and the equal protection clause of the fourteenth amendment of the United States Constitution. *See In re Birmingham Reverse Discrimination Litigation,* 20 F.3d 1525, 1536 (11th Cir.1994). A consent decree is subject to the same analysis as a voluntary affirmative action plan. *Id.* at 1534.

The Eleventh Circuit held that the 1987 consent decree's provisions did not invoke strict scrutiny and were not invalid under the fourteenth amendment's equal protection clause. *Allen,* 164 F.3d at 1352–54. More-

---

**2.** The objection, filed on behalf of the faculty of the Alabama State University College of Education, took issue with the sources cited for producing teacher testing standards, particularly concerning the absence of other "recognized and reputable sources for professional teaching standards."

over, the amended consent decree provides the defendants with the option of using tests without regard to the p-value restrictions, the provision of the original consent decree which the defendants challenged as impermissibly race-conscious. More specifically, while the amended consent decree leaves in place the provisions of the existing consent decree prescribing the p-value restrictions, the structure of the new agreement allows the defendants to bypass those provisions entirely. Because the amended consent decree does not contain any additional race-conscious provisions, the court finds that it does not contravene the equal protection clause or Title VII. The court concludes that the amended consent decree is not illegal or against public policy.

## VI. CONCLUSION

For the reasons described above, the court will approve the amended consent decree. However, as the court indicated at the beginning of this opinion, it does so reluctantly. This court has repeatedly made clear that "A court's end purpose in institutional litigation, such as this, is to remedy the violation and then to restore to local or state authorities complete control of the institution operating in compliance with federal law." *Sims v. Montgomery County Comm'n*, 890 F.Supp. 1520, 1534–35 (M.D.Ala.1995) (Thompson, J.) (citing *Missouri v. Jenkins*, 515 U.S. 70, 97–98, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995); *Freeman v. Pitts*, 503 U.S. 467, 489, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992)), *aff'd*, 119 F.3d 9 (11th Cir.1997) (table). This case is already approaching 19 years, and, with the entry of the amended consent decree, its life will extend for another ten years, and more than likely even 15 years. The court must candidly state that this aspect of the proposed consent decree is troubling, for it means that not until the year 2010, or probably not until the year 2015, will the State of Alabama gain complete control of its teacher testing program. This is a very long time. However, in view of the fact that not only the plaintiffs but also the defendants, acting on behalf of the State of Alabama, have requested that the court approve the proposed consent decree, the court will approve the decree.

An appropriate order will issue.

## ORDER

Based upon the memorandum opinion entered on this date, it is the ORDER, JUDGMENT, and DECREE of the court that the proposed amendment of the parties, embodied in a proposed amended consent decree, is approved and adopted by the court.

## APPENDIX

### *AMENDED CONSENT DECREE*

The individual plaintiffs and the class they represent (hereinafter "the class representatives")[1] challenge in this litigation the defendants' implementation and use of the Alabama Initial Teacher Certification Tests. The class consists of all black persons who have been or will be denied any level teaching certificate because of their failure to pass the tests administered by the Alabama Initial Teacher Certification Testing Program. Plaintiff-intervenor is the Board of Trustees for Alabama State University. In general, the class representatives and plaintiff-intervenor claim that: (1) the tests were implemented without adequate notice to the students and colleges; (2) the tests are unfair because they test students on matters which the students were not taught in the classroom; (3) the tests have an adverse and disproportionate impact on black colleges and black students: (4) the tests are culturally biased and bear no relationship to job performance as a teacher; (5) the tests' disparate impact on blacks cannot be justified because said tests were not properly validated; and (6) that the actions of the defendants violate statutory and constitutional rights of the class representatives and plaintiff-intervenor.

The defendants deny these allegations and affirmatively assert that the process by which the tests were prepared did insure the tests to be valid. The defendants also assert

---

**1.** By order dated August 13, 1985, Eria P. Smith was allowed to intervene and become an additional class representative. For purposes of this Amended Consent Decree, Eria P. Smith is referred to as a class representative and not a plaintiff-intervenor.

that they are using the tests as a device to insure that teachers in the classrooms of Alabama will have the knowledge necessary to teach.

The class representatives, plaintiff-intervenor and the defendants are desirous of implementing a solution to these issues without the further expense of litigation. The parties have waived further hearing and have agreed on the form of this decree. The defendants do not admit and expressly deny that they have acted in any manner to violate the Constitution, any statute of the United States, or any other law or statute.

The Court is of the opinion that entry of this decree will effectuate the mandate of the Constitution and federal law. Accordingly:

IT IS ORDERED, ADJUDGED AND DECREED as follows:

1. The defendants, their agents, servants and employees are hereby permanently enjoined from using any teacher certification examination which has a disparate impact on black teacher candidates for initial, advanced level or provisional certification, unless said examination has been validated for the purpose of teacher certification.

2. The defendants may require, as a precondition for certification to teach in the State of Alabama, that a candidate successfully complete a written subject-matter examination. The following conditions concerning this examination shall apply:

(a) The examination shall test only those matters which are contained in the approved teacher education program curriculum requirements for Alabama's teacher training institutions.

(b) The items proposed to be used in any operational examination shall be field tested using a large scale field test. Based on item statistics derived from the field test, items shall be categorized and used in the new examination as follows:

(1) Type I. Items for which the item difficulty (i.e.p-value) for blacks and whites differs no more than 5%.

(2) Type II. Items for which the item difficulty (i.e.p-value) level for blacks and whites differs by a percentage which is greater than 5% but not more than 10%.

(c) (1) In devising a test under the provisions of paragraph two of this consent decree, Type I items shall be used exclusively as scoreable items, so long as they are available in sufficient numbers to provide comprehensive coverage of the objectives sought to be measured in the examination.

(2) Type II items shall be used as scoreable items, only if Type I items are not available in sufficient numbers to provide comprehensive coverage of the objectives sought to be measured in the examination.

(3) In no event shall the defendants use scoreable items which are not classified as Type I or Type II, except as provided for in subparagraph (d) below or as provided for in paragraph three of this Amended Consent Decree.

(d) After a subject-matter examination developed under the provisions of paragraph two of the consent decree has been administered to a sufficient number of examinees to judge the racial effect of the items, that number being determined by the expert monitoring panel established in paragraph 10 herein, defendants shall reclassify items on the basis of the actual administrations of the tests as Type I or Type II, described above, and as Type III the last being defined as items for which the item difficulty (i.e.p-value) level for blacks and whites differ by a percentage which is greater than 10% but not more than 15%. The defendants may thereafter use Type III items as scoreable items on test administrations following the reclassification procedure, only if they have exhausted the available supply of Type I and Type II items, respectively. In such event, not more than 10% of the scoreable items on such subsequent subject-matter examinations shall be Type III items unless otherwise agreed to by the monitoring panel.

3. In the alternative to development of tests pursuant to paragraph two, above, the defendants may require, as a precondition for initial certification to teach in the State of

Alabama, that a candidate successfully complete and pass a basic skills test designed to measure whether an applicant for initial teacher certification has a level of competence in reading, writing and mathematics that is sufficient to protect the interests of the public school children of Alabama (hereinafter "the basic skills test"), provided that the basic skills test has been validated for such use as provided for herein.

4. The basic skills test may be selected by the defendants from products available in the marketplace, or may be developed by defendants specifically for use in Alabama. If defendants elect to use an existing test, defendants shall provide to the other parties and the Monitoring Committee (which is provided for elsewhere herein) sufficient information to demonstrate that the proposed test is suitable for its intended purpose, recognizing that the ultimate suitability of the test may be determined only after the results of the validity investigations hereinafter required by this decree are known. The Monitoring Committee may (i) agree that the proposed test may go forward to the validation stage, (ii) request additional information from the defendants, or (iii) either with or without additional information, object to the proposed test on the basis that it is not suitable for its intended purpose and therefore should not be subjected to the required validity investigations. If the Monitoring Committee agrees to allow the proposed test to move to the validation stage, the conditions and process specified in paragraph five shall take effect and govern. If the Monitoring Committee objects to the proposed test, it shall state its specific reasons in writing and furnish same to the parties. If defendants wish to pursue use of the proposed test over the Monitoring Committee's objection, they may present the matter to the other parties and seek resolution by agreement of the parties. If the parties cannot agree on the matter, defendants may file an appropriate petition with the Court, which shall decide the issue in such proceedings as the Court may deem appropriate. No such petition shall be filed, however, until after the parties have attempted in good faith to resolve the issue among themselves, including the use of mediation if requested by a party and so ordered by the Court.

5. If defendants elect to use an existing test as the basic skills test and such test is sanctioned under paragraph four, the following conditions concerning the utilization of the basic skills test by the defendants for initial certification as a teacher in the State of Alabama shall apply:

(a) The basic skills test shall be validated for use as a certification test for an initial Alabama teaching certificate in accordance with prevailing professional standards, the technical standards contained in the 1978 Uniform Guidelines on Employee Selection Procedures, 43 Fed.Reg. 38240, to the extent said Guidelines are applicable, and the most current Standards for Educational and Psychological Tests authored by the American Psychological Association (APA), the American Educational Research Association (AERA), and the National Council for Management in Education (NCME). This validation study may be performed in part by the developer or publisher of the basic skills test (if any), as provided below, but in any event an independent contractor shall be engaged by defendants for this purpose, as also provided herein. For purposes of selecting this independent contractor, defendants shall prepare a Request for Proposals (RFP), which shall be submitted to and reviewed by the Monitoring Committee provided for herein, which shall offer its advice and comments to defendants and assist defendants as requested with the selection of the independent contractor. While their decisions are to be closely guided by the advice and recommendations of the Monitoring Committee, ultimate approval of and responsibility for all aspects of the validation study shall reside with defendants, within the terms and conditions of this Amended Consent Decree.

(b) The validation study for the utilization of the basic skills test by the defendants shall provide for two distinct domains of validation evidence. At least one domain of evidence must be from an empirically based criterion-related validity in-

vestigation that evaluates performance on the basic skills test with regard to one or more appropriate external criteria. An independent contractor other than the test developer-publisher will be engaged by defendants, pursuant to the RFP described above, to conduct the empirically based criterion-referenced validity investigation and the empirically based cutscore investigation described below. The remainder of the validity study may be conducted by the test developer-publisher or the independent contractor, as determined by defendants, within the terms and conditions of this Amended Consent Decree.

(c) The validity study shall also include appropriate investigations of job relevance of the knowledge and skills to be tested and of the items on the basic skills test. Appropriate investigations of curricular validity and instructional validity shall also be conducted. If defendants elect to have these investigations carried out by the test developer-publisher, the Monitoring Committee shall have the opportunity to review and suggest changes to the proposed design of the studies.

(d) The validity study shall also include item and test bias studies the results of which are to be formally reported. Both logical and empirical bias investigations shall be conducted and the results reported, but it shall be acceptable for the contractor(s) to report and rely upon empirical results that may be available from the test developer-publisher or from other professional evaluations of the basic skills test. Under any circumstances, however, a logical review investigation of the basic skills test involving Alabama black educators must be included in the validity study and the results thereof formally reported. The black educators who form this bias review panel shall be approximately eight in number, shall be nominated by all the parties, and shall be selected by the State Superintendent of Education, according to the criteria and qualifications established by the State Superintendent and approved by the Monitoring Committee. Not more than half of the persons selected shall be per-

sons nominated by defendants, provided that there are a sufficient number of persons nominated by the plaintiffs and plaintiff-intervenor.

(e) Findings from the various investigations included in the validity study will be reported by the contractor(s) or the defendants to the Monitoring Committee for study and evaluation. The Monitoring Committee shall report its findings and make recommendations to defendants regarding the use of the basic skills test as a factor in making certification decisions.

(f) A cutscore for each subtest of the basic skills test (reading, writing and mathematics) will be established. An overall score on the entire basic skills test is not to be used for certification decisions, and no cutscore for the overall test will be established. In establishing cutscores for the respective subtests, it is to be understood that defendants seek to establish a level of competence in reading, writing and mathematics for all prospective teachers that is sufficient to protect the interests of the public school children of Alabama, and that the effort to identify sound, reliable and defensible cutscores is to be guided by prevailing professional standards in accordance with the technical standards contained in the 1978 Uniform Guidelines on Employee Selection Procedures, 43 Fed. Reg. 38240, to the extent said guidelines are applicable, and the most current Standards for Educational and Psychological Tests authored by the American Psychological Association (APA), the American Educational Research Association (AERA), and the National Council for Management in Education (NCME) for setting cutscores. These policy decisions are to be reflected in the RFP.

(g) At least two approaches are to be used to ascertain cutscores for the basic skills test, one of which must be an empirical (examinee-centered) method. The empirical cutscore investigation shall be carried out by the same independent contractor which performs the empirically-based criterion-referenced validation study. The second approach may be a judgmental standard setting investigation (test-centered), which may be conducted

by the test developer-publisher. This study shall be designed and carried out with input from the Monitoring Committee, but subject to defendants' final approval. Information gained from both approaches shall be used in setting cutscores.

(h) Findings from the cutscore investigation, along with recommendations for the subtest cutscores, will be reported to the Monitoring Committee by the independent contractor and, if applicable, the test developer-publisher. The Monitoring Committee will in turn make recommendations to the defendants by identifying an appropriate cutscore range separately for each of the three subtests. In establishing these ranges, the Monitoring Committee will determine whether it would be advisable, based on the findings of the cutscore studies, test properties as found through the validation studies, and features of the investigations, to reduce potential high rates of false negatives by adjusting the recommended cutscores by a factor of the standard error of measurement or the standard error of the mean, or both. The Monitoring Committee shall also consider defendants' policy to establish academic standards for prospective Alabama teachers that are sufficient to protect the interests of the public school children of Alabama. While giving priority to adherence to sound psychometric principles, including the need to insure validity of the inferences to be made from the test scores, the Monitoring Committee shall also consider the desire of all parties to avoid unnecessary adverse racial impact. The Monitoring Committee shall address these and other appropriate considerations in its report to the defendants, who shall set the final subtest cutscores within the ranges established by the Monitoring Committee.

6. If defendants elect to develop a basic skills test specifically for use in Alabama, the following conditions concerning the development and utilization of such test shall apply:

(a) Any independent contractor(s) engaged to develop a basic skills test, or to conduct validity studies or cutscore investigations in connection with any such test developed by or for defendants, shall be selected as provided in paragraph 5(a), above.

(b) Prior to commencement of the test development process, the defendants will provide the Monitoring Committee an outline of the proposed process and such other information as needed for the Monitoring Committee to make a preliminary determination as to whether the proposed process is psychometrically sound and in compliance with the validation and standard setting requirements of this decree. The Monitoring Committee may (i) agree that the proposed process is satisfactory and should go forward, (ii) request additional information from the defendants, or (iii) with or without additional information, object to the proposed process. The Monitoring Committee will not object to the proposed process without first engaging with the defendants in an effort to resolve any concerns or disagreements. If the Monitoring Committee objects to the proposed process, it shall state its specific reasons in writing and furnish same to the parties. If the defendants wish to pursue the proposed process over the Monitoring Committee's objection, they may present the matter to the other parties and seek resolution by agreement of the parties. If the parties cannot agree on the matter, defendants may file an appropriate petition with the Court, which shall decide the issue in such proceedings as the Court may deem appropriate. No such petition shall be filed, however, until after the parties have attempted in good faith to resolve the issue among themselves, including the use of mediation if requested by a party and so ordered by the Court.

(c) The provisions of paragraphs 5(a) through 5(h), including but not limited to the validation and standard setting requirements and the requirements for involvement by the Monitoring Committee set out therein, shall apply to the defendants' test development effort.

(d) In addition to providing information to and consulting with the Monitoring Committee as specifically required in

paragraphs 5(a), 5(c), 5(e), 5(g) and 5(h), the defendants will generally keep the Monitoring Committee advised in writing of the progress of the test development effort. At any time the Monitoring Committee may request additional information from the defendants, and at any time the Monitoring Committee may note its concerns as to any aspect of the process, stating its reasons in writing and furnishing same to the parties. Upon receipt of any such statement of concern, the parties will attempt in good faith to resolve the issue among themselves and to the satisfaction of the Monitoring Committee, including the use of mediation if requested by a party and so ordered by the Court. If the dispute is not resolved, the plaintiffs and/or plaintiff-intervenor may seek intervention by the Court but, pending resolution of the matter by the Court, the defendants may proceed with the test development process at their own risk of loss. In any proceeding relating to this provision, the Court shall approve defendants' proposed action only upon a finding that the proposed action would be consistent with generally accepted psychometric and measurement principles.

7. The basic skills test developed or used pursuant to paragraphs three through six, above, shall not be used or required by defendants as a precondition for admission to an approved teacher education program; provided, however, that nothing herein shall preclude an institution of higher education from using scores on the basic skills test, achieved in administrations of the test offered by the defendants, in connection with the institution's decision regarding whether to admit an applicant to the institution's teacher education program. There will be not less than two regular administrations of the test annually at each of the four sites. If necessary, the State Superintendent of Education shall authorize one additional administration of the test for the entire state at the Montgomery site during the summer.

8. The defendants are hereby permanently enjoined from using any past or present Basic Professional Studies Examinations as a separate test requirement. However, nothing herein shall preclude the defendants from incorporating into any future subject-matter examination developed pursuant to paragraph two, above, a select number of test areas covered in the existing Basic Professional Studies Examinations, provided (a) that test items on such areas comply with the item difficulty restriction set forth in paragraph two above, and (b) that said items test matters contained in the approved teacher education program curriculum requirements for Alabama's teacher training institutions of higher education.

9. Should the defendants elect under paragraph two, above, to continue teacher certification examinations as a part of their existing certification requirements, they shall, as soon as practicable after the entry of this decree, implement the development of subject-matter examinations to assure that said examinations meet the specifications mandated by paragraph two herein and are developed and validated in accordance with the technical standards contained in the 1978 Uniform Guidelines on Employee Selection Procedures, 43 Fed.Reg. 38240, to the extent said guidelines are applicable, and the most current Standards for Educational and Psychological Tests authored by the American Psychological Association (APA), the American Educational Research Association (AERA), and the National Council for Measurement in Education (NCME).

10. Should the defendants elect under paragraph two, above, to continue teacher certification examinations as a part of their existing certification requirements, they shall notify the Court and parties of their intent to do so within thirty (30) days after the entry of this decree. Upon said notification, the class representatives, plaintiff/intervenor ASU, and defendants shall each within fourteen (14) days of said notification, submit the name of one testing expert to the court and the court will impanel these persons as a three-person, independent panel whose task will be that of monitoring and overseeing the test development process. The panel members shall be paid their customary consultant's fee and reasonable expenses by the defendants. The panel members shall be

responsible to the defendants for reporting that all phases of the Alabama Initial Teacher Certification Testing Program, if continued by the defendants, are in conformity with the testing principles and standards enunciated in this decree. The panel shall make reports and give appropriate advice and recommendations to the defendants, as often as desired, and shall make annual status reports to the Court and parties regarding the defendants' compliance with the technical standards contained in this decree. In the event that either the class representatives' expert or ASU's expert on the aforesaid panel resigns or otherwise is unable to perform his or her responsibilities, the class representatives and ASU shall form a committee composed of one person selected by the Allen class representative, one person selected by the Smith class representative, and one person selected by ASU. This committee will within sixty (60) days select the replacement for the panel via a majority vote.

11. Should the defendants elect under paragraph three of this Amended Consent Decree to implement the basic skills test, they shall notify the Court and parties of their intent to do so within thirty (30) days after the entry of this Amended Consent Decree. Upon said notification the class representatives, plaintiff-intervenor ASU and defendants, respectively, shall within fourteen (14) days thereafter submit the name of one testing expert to the court and the court will impanel these three persons as a Monitoring Committee, whose task will be to provide oversight and recommendations regarding use of the basic skills test as provided for elsewhere herein. In the event that either the class representatives' expert or ASU's expert on the aforesaid panel resigns or otherwise is unable to perform his or her responsibilities, the class representatives and ASU shall form a committee composed of one person selected by the Allen class representative, one person selected by the Smith class representative, and one person selected by ASU. This committee will within sixty (60) days select the replacement for the panel via a majority vote.

12. Should the defendants elect under paragraph three of this Amended Consent Decree to implement the basic skills test, the Monitoring Committee shall select a chair from among its members, who shall convene and conduct the Committee's meetings and coordinate its work. While remaining faithful to the obligations placed on it by this Amended Consent Decree, the Monitoring Committee will at all times act reasonably and prudently with regard to the amount of time and expenses devoted to the performance of their duties and responsibilities hereunder. The chair of the Monitoring Committee shall coordinate the Monitoring Committee's work in such a way as to achieve all reasonable economies, giving due regard to both the requirements of this decree and the public fisc. In fulfilling this responsibility, the chair will consult with the defendants to develop a budget or other plan for the Committee's work. Any disputes regarding the Monitoring Committee's fees and expenses, if not first resolved informally, may be brought to a decision by the Court upon petition filed by the defendants.

13. In addition to the duties and responsibilities as identified under paragraphs four, five, six, 11 and 12 of this Amended Consent Decree, the Monitoring Committee shall annually review results of the basic skills test administration for Alabama examinees and evaluate the psychometrics of same, including performance disparities between majority and minority groups, adverse impact, adequacy of cutscores, and continuing adequacy of existing validation evidence. The Monitoring Committee shall issue an annual report to defendants by October 30th of each year, including any recommendations. In its annual report following the third year of use of the basic skills test, the Monitoring Committee shall make a recommendation to defendants regarding the continued use of said test. This recommendation shall be based upon a formal evaluation of the basic skills test through a study design formulated by defendants with the Monitoring Committee's advice and conducted at defendants' expense. For purposes of this paragraph, the third year of use of the basic skills test is contemplated as 2004. The recommendation of the Monitoring Committee regarding the contin-

ued use of the test shall be provided to the parties by October 30, 2004.

14. The defendants shall include in any test development process, pursuant to paragraph two, above, in addition to all of the other standards enunciated herein, a review of all examinations for racial bias by panels of black Alabama educators who have expertise in the content field area of the tests they are reviewing. This panel, who will be selected by the State Board of Education from a list of nominees approved by the State Superintendent of Education and the class representatives according to criteria established by the Monitoring Committee established in paragraph 10, shall make recommendations to the test Monitoring Committee concerning their findings of bias, if any.

15. If the defendants elect to continue a teacher certification examination requirement pursuant to paragraph two, above, the State Board of Education shall revise its teacher certification examination process so that prospective teacher certification candidates are evaluated on the basis of the following criteria:

(a) Student performance as reflected by grade point average (GPA) on courses which are part of an approved teacher education program (approved program GPA).

(b) Student performance on the written examination (written test score) devised in accordance with paragraph two herein.

16. If the defendants elect to continue a teacher certification examination, pursuant to paragraph two, above, the State Board of Education shall revise its administrative regulations governing the teacher certification examination for persons seeking a teaching certificate for the first time to provide that if the certification candidate does not achieve a passing score on the certification examination the final decision to certify will be made on the basis of a total score derived from the two criteria: (a) approved program GPA and (b) written test score. In devising the formula to arrive at a final score the written test score shall count 50% and the approved program GPA shall count 50%. The precise

formula to be used is set forth in Appendix A to this Decree and is hereby incorporated by reference thereto.

17. With respect to teachers who hold a regular teaching certificate and who seek certification in a different teaching field, if the candidate for certification does not achieve a passing score on the certification examination administered, pursuant to paragraph two, above, the final decision to certify shall be made on the basis of a total score derived from the approved program GPA and the written test score. In devising the formula to arrive at a final score the written test score shall count 50% and the approved program GPA shall count 50%. Said formula is set out in Appendix A.

18. Should defendants elect to use the basic skills test for initial certification decisions, pursuant to paragraph three above, the following provisions shall govern in lieu of paragraphs 15, 16, and 17 above:

(a) An applicant who does not achieve the established passing score for a given subtest may nevertheless satisfy that requirement through a combination of the applicant's subtest score and grade point average ("GPA"), as defined below, provided such GPA is at least 2.5 on a 4.0 scale. For purposes of this decree, no GPA which is fractionally less than 2.5 shall be rounded upward so as to constitute a 2.5 GPA.

(b) GPA shall mean the applicant's cumulative GPA on all regularly scheduled coursework that is included in the applicant's undergraduate core curriculum. The undergraduate core curriculum is coursework completed typically during an undergraduate student's first two years of general education studies and which generally coincides with the "general studies curriculum" as defined or established by the Alabama Articulation and General Studies Committee created by the Alabama Legislature in Act No. 94–202, operating under the direction of the Alabama Commission on Higher Education. The defendants shall adopt appropriate administrative regulations to implement this provision, including such provisions as may be necessary to recognize potential differ-

ences among institutions in the way the undergraduate core curriculum is defined.

(c) Applicants to whom this paragraph applies shall have their subtest score and GPA combined generally using the guidelines set out in paragraphs 18(a), and 18(b), above, and the principles underlying Appendix A. Calculations, weighting and exact formulas for combining an applicant's subtest score and GPA are to be established by the Monitoring Committee, taking into account the unique scale properties of the basic skills test, but in a manner essentially equivalent to that described in paragraphs 15 and 16 above, and Appendix A, which paragraphs provide that the relevant written test score and GPA shall each contribute equally to the applicant's final score. The threshold for consideration of any applicant's GPA for combination with a basic skills test subtest score shall be a minimum 2.5 on a 4.0 scale in the undergraduate core curriculum as defined herein in paragraph 18(b).

(d) An applicant who does not achieve the established passing score for a given basic skills subtest, and who also does not satisfy that requirement through the combining of the applicant's subtest score and GPA (hereinafter "unsuccessful applicant"), may nevertheless satisfy that requirement by attending and passing a remediation course as described below. This option will be available, however, only to an applicant whose GPA is at least 2.5 on a 4.0 scale, with said GPA being calculated as provided in paragraphs 18(a) and 18(b), above.

(e) Defendants will offer coursework to an unsuccessful applicant designed specifically to allow the applicant to acquire and demonstrate competence on those mathematics, reading and writing knowledges and skills embodied in the basic skills test. The successful completion of the course shall include the applicant's passage of a course completion assessment. The passage of this exit assessment shall be on a pass/fail basis. An applicant may elect to retake the relevant subtest of the basic skills test in lieu of the course exit assess-

ment. The defendants shall be responsible, within the terms and conditions of this Amended Consent Decree, for the design and delivery of the remediation course and for the design and administration of the exit assessment.

(f) An applicant for initial teacher certification may take the basic skills test an unlimited number of administrations, and may satisfy the basic skills test requirement at any time available prior to or after the applicant's completion of an approved teacher education program. An applicant shall be entitled to use his or her highest respective subtest scores for all purposes contemplated by this decree. Additionally, once an applicant achieves a passing score on a subtest of the basic skills test (*i.e.*, reading, writing, or mathematics), he will be deemed to have successfully completed that subtest, irrespective of any subsequent score on that subtest.

(g) Separate mathematics, reading and writing courses are to be offered to unsuccessful applicants annually in at least four sites, which shall include Madison County, Jefferson County, Montgomery County and Mobile County. Alabama State University shall serve as the Montgomery County site. Based on experience gained during the first full operational year of these courses, the defendants shall, in consultation with the Monitoring Committee and the other parties, consider whether additional or different sites would better serve the respective interests of the State and the applicants. The final decision regarding different or additional testing sites shall rest with the defendants. Defendants may charge a reasonable fee for these courses, but any such fee shall be set so as not to unreasonably deny access to applicants of limited means. These courses and their content, which is to be defined by the content domain of the relevant subtest of the basic skills test, are to be developed by defendants or their agents. The Monitoring Committee will review all materials necessary to determine and assure that the courses cover the same content domain as the relevant subtest. Providers of the approved coursework are to be approved by defendants.

In developing the coursework and any evaluation techniques or instruments used in connection therewith, the defendants shall act in accordance with sound educational and psychometric practices. The Monitoring Committee will make such review as necessary to determine and assure that applicants are fairly and appropriately assessed on whether or not they meet the course objectives. The Monitoring Committee will review the defendants' plan for offering these courses, with attention to these and other matters, such as access to and equivalence of testing properties of the courses.

19. Teachers who hold a regular teaching certificate and who seek higher level certification in the same field shall not be required to pass an initial teacher certification examination. Teachers presently holding a teacher certificate shall not be required to pass the basic skills test for renewal of their existing Alabama Professional Educator Certificate. Should a teacher allow his or her Alabama Professional Educator Certificate to lapse due to non-renewal or should an existing certificate be revoked, the teacher applying for a teaching certificate shall be required to complete all requirements for initial applicants, including passage of the basic skills test, provided, however, that a teacher whose certificate has lapsed due to non-renewal may, within six months of the date of expiration of the former certificate, apply for re-certification without being required to pass the test.

20. Should the defendants wish to use the basic skills test for any purpose other than initial teacher certification decisions (*e.g.,* certification in a different field of a previously certified teacher or certification for administration), such additional use must be approved by the Monitoring Committee and will be subject to such conditions, including but not necessarily limited to, additional validity and/or cutscore investigations, as the Monitoring Committee may recommend. Provided defendants act in accordance with the recommendations of the Monitoring Committee, no court approval shall be necessary in order to use the basic skills test for such additional purpose(s).

21. The parties to this decree agree that defendants' use of the basic skills test, in accordance with the terms of this decree applicable to said test, will constitute compliance with the consent decree to the same extent as would their development and use of the subject-matter examinations described in paragraph two, above.

22. The parties recognize and agree that, notwithstanding any provision of this decree, defendants are not required to develop or administer any teacher certification test, and may at any time abandon the use of any test previously administered.

23. Should defendants conclude that any basic skills test previously in use should not (or cannot) continue to be used for making certification decisions, defendants may propose to use another test for that purpose in lieu of the existing test. If the defendants propose to use another existing test as the replacement test, the provisions of paragraphs four and five, above, shall govern. If the defendants propose to develop a replacement test specifically for use in Alabama, the provisions of paragraph six, above, shall govern. The plaintiffs and plaintiff-intervenor may file an objection to the use of a proposed replacement test, and the filing of such an objection shall cause an automatic stay of the use of the replacement test pending consideration of the Court.

24. Notwithstanding any other provision of this decree, and specifically without regard to the provisions of paragraph two, the defendants may require that applicants for initial teacher certification successfully complete, in addition to the basic skills test, a subject matter specific test appropriate to the area in which certification is sought (hereinafter "subject matter tests"). The following terms, conditions and limitations shall apply to the selection, development and/or use of such tests by the defendants:

(a) Subject matter test scores shall not be used for certification decisions for a period of at least five (5) years following approval of this decree by the Court. Before that time, however, such tests may be developed and pilot tested.

(b) If the defendants elect to use subject matter tests for certification decisions, this decree shall be extended by five (5) years from the expiration date set out in paragraph 28, which would otherwise apply.

(c) Regardless of whether defendants use commercially available subject matter tests or develop subject matter tests specifically for use in Alabama, such tests must be professionally validated for their intended purpose. The parties agree that if defendants elect to use subject matter tests, all aspects of the subject matter tests shall be subject to review and approval by the Monitoring Committee, including, but without limitation, design, development, validation, and standard setting processes. Defendants may not pursue a course of action in the design, development and implementation of the subject matter tests which is contrary to a position of the Monitoring Committee, absent a showing and finding by the Court that the Monitoring Committee's position on the matter is inconsistent with generally accepted psychometric and measurement principles.

(d) The provisions of this decree which allow applicants who are unsuccessful on the basic skills test to be certified based upon consideration of their GPA, or through successful completion of a special remediation course, shall also apply to applicants who are unsuccessful on a subject matter test. It is the parties' intent here that the rights and privileges of teacher candidates under this decree to gain certification through use of their GPA's and/or through successful completion of special course remediation, shall not be less with respect to subject matter tests than they are with respect to the basic skills test. The technical details associated with use of an applicant's GPA shall generally follow the provisions of paragraphs 18(a) and 18(c), above, and Appendices A and B to this decree, which are incorporated by reference. Availability of and reliance upon remediation course work associated with the subject matter tests shall be generally consistent with the provisions of paragraphs 18(d), 18(e), and 18(g), above. The

parties recognize that certain technical and other details, such as the college courses which will form the basis for calculating the GPA to be used and the appropriate content of the remediation courses, are left unresolved. Those remaining details are to be resolved between the parties prior to implementation of a subject matter test requirement. If the parties are ultimately unable to reach agreement on any such detail, the issue in question may be presented to the Court for resolution, and the Court will have the authority to grant such relief and make such orders as it deems necessary to effectuate the purpose and spirit of this paragraph, considered in connection with the decree as a whole. No petition shall be filed with the Court, however, until after the parties have attempted in good faith to resolve the issue among themselves, including the use of mediation if requested by a party and so ordered by the Court.

25. Defendants shall cause court-approved class notice to be published in major daily newspapers in the cities of Huntsville, Birmingham, Montgomery, Mobile, Tuscaloosa, Dothan, Decatur and Gadsden, Alabama, twice each week, including one Sunday edition, if published, for three consecutive weeks, beginning 21 days from preliminary approval of this decree, or otherwise as may be ordered by the Court. In addition, defendants shall send the notice to the presidents (or chief executive officers) and deans of education of all Alabama colleges and universities which operate approved teacher education programs and to the presidents or chief executive officers of all Alabama postsecondary (two-year) institutions. Defendants shall request these officials to post and distribute the notice at their respective institutions as broadly as practicable.

26. Defendants shall pay to counsel for the plaintiff class, which includes counsel for Eria P. Smith, their reasonable attorneys' fees and costs incurred in connection with this action. The parties will attempt to agree upon the fees and costs, but if they cannot, they shall submit the matter to the Court for decision. Additionally, counsel for the plaintiff class shall be provided reason-

able fees and expenses in monitoring compliance with this Consent Decree. Each year on or about the anniversary of the entry of this Decree, until one year after any new examination program is made operational, counsel for the plaintiff class shall submit to the Court a petition setting forth their fees and expenses for services rendered in monitoring compliance with this Decree, and, if the parties cannot agree upon the fees and expenses, the Court shall fix the amount of such fees and expenses to which class representatives' counsel are entitled.

27. The defendant and their agents, servants, and employees shall not disclose any information with respect to any teacher or teacher certification candidate about the method or formula used to make the final decision to certify the teacher or teacher certification candidate as it relates to the testing, GPA, and/or course completion provisions of this Amended Consent Decree.

28. The Court shall retain jurisdiction over this matter to monitor and enforce the defendants' compliance with the terms of this Decree to the extent necessary. Unless extended in accordance with paragraph 24, this consent decree, as amended, shall terminate in all respects and for all purposes on the date ten (10) years following its approval by the Court, unless the class representatives shall, not later than six months prior to the scheduled expiration date, petition and show good cause for an extension of the decree. The Court shall conduct such proceedings as it deems necessary for the resolution of any such petition. The parties contemplate that, because of the nature of psychometric principles and establishing legitimate psychometrically defensible trends from the validation data and implementation of the basic skills test, this process will exhibit varying dynamics during the first years of its utilization. The parties agree that the initial use of the basic skills test for initial teacher certification decisions by the defendants is contemplated to be effective not later than the Spring administration in the year 2002. The Monitoring Committee will make its report to the defendants with recommendations for the continued use of the basic skills test by the defendants no later than October 30, 2004. This report will include consideration of results from all test administrations to date as well as other appropriate information. Following the Monitoring Committee's report and any adjustments deemed appropriate by the State Board of Education, the Defendants will enter a five (5) year phase of implementation of the basic skills test for initial teacher certification decisions with a less comprehensive role for the Monitoring Committee as far as the complexity of its annual report under the provisions of Paragraph 9 of this Amended Consent Decree. The parties agree and contemplate that the termination of this Amended Consent Decree would occur on or about October 30, 2009 unless terminated earlier by agreement of all parties and consent of this Court, or extended pursuant to paragraph 24. If defendants comply in good faith with this decree for the prescribed period, all parties agree that they will not contend that there are any remaining vestiges of segregation or racial discrimination relating to the Alabama Initial Teacher Certification Tests, and they further agree that they will urge the Court to enter a finding to that effect.

29. The Defendant State Board of Education shall be authorized to develop administrative rules and regulations for the implementation of the terms of this Amended Consent Decree. The parties recognize the need for the State Board of Education to adopt administrative code provisions which provide for directives on educational accountability requirements. These provisions may include, for example, issues such as reciprocity of teacher certificates from other states. The State Board of Education agrees to consider the spirit of this Amended Consent Decree in the adoption of administrative rules and regulations pertaining to teacher testing, as well as the psychometric parameters recommended by the Monitoring Committee. However, the State Board of Education shall have the sole authority for approval and adoption of administrative code provisions consistent with state law.

Done this 5th day of January, 2000.

/s/

United States District Judge

This document is approved by the plaintiffs' class counsel as evidenced by their signatures below. The counsel for the plaintiff-intervenor signs acknowledging this amended consent decree and it remains subject to the approval of the plaintiff-intervenor's board. The defendants' counsel signs only for the purpose of acknowledgement of the proposed amended consent decree and the amended consent decree remains subject to approval by the State Board of Education.

/s/

Donald V. Watkins

/s/

Valerie L. Acoff

Allen Class Counsel

/s/

Gregory B. Stein

/s/

Fred D. Gray, Sr.

Smith Class Council

/s/

David W. Long

Alabama State University Counsel

/s/

Michael R. White

General Counsel Alabama State Board of Education

/s/

Edward Hosp

Deputy Legal Advisor to the Governor

### APPENDIX A

#### EQUATING GPA TO TEST SCORES

Raw scores on the test are converted so that the minimum passing score is 70 for all tests. This is the Converted test score. "Approved program GPA" is the GPA attained in the candidate's approved teacher education program; it is not the cumulative GPA for all college courses attempted. Under State Board of Education regulations, the lowest acceptable approved program GPA is 1.2 on a 3 point scale. On a 4 point scale this equates to a 2.2.

For candidates graded on a 3 point scale, an approved program GPA of 1.2 should be equated to a converted score of 70 on the test. To do otherwise would change the minimum passing requirement. A GPA of 3.0 on a 3 point scale represents grades which are all A's. This reasonably can be equated to a typical A which is represented by a converted test score of 95.

The scale for GPA's extends from 1.2 to 3.0, a range of 1.8 points. The scale for test scores extends from 70 to 95, a range of 25 points. Hence, each point of GPA is equivalent to $25/1.8 = 13.889$ points on the test scale. Thus candidates graded on a 3 point scale would receive an equated converted score of $70 + [13.889(GPA-1.2)]$ where "GPA" is the approved program GPA. Candidates graded on a 4 point scale would receive an equated converted score of $70 \div [13.889(GPA-2.2)]$. Application of this formula equates GPA to test score. To determine the final score of a candidate the following formula is used.

converted test score $\div (70 + [13.889(GPA-1.2)])$

If the result is 70 or greater, the candidate passes. For candidates on a 4 point scale, 2.2 should be substituted for the 1.2 in the formula.

### APPENDIX B

On a 100 item multiple-choice test with four possible answers for each item, a candidate who guesses on every question has an expected raw score of $100(.25) = 25$ items correct, with a standard deviation of $100(.25)(.75) = 4.33$ questions. Once certification is achieved in a particular subject-matter there is no further requirement that a candidate demonstrate mastery of the body of knowledge deemed necessary for the certificate. Candidates have an unlimited number of chances to successfully complete the test. Upon consideration that certification permits a person to be employed to teach the children of this State, it is evident that this relatively high risk situation justifies a stringent guessing requirement. Accordingly, the minimum acceptable raw score for demonstration of requisite content knowledge would be at the point at which a candidate has only one chance in one thousand of meeting the requirement by guessing. The appropriate score is then 3.09 standard deviations above the mean, a score of 38.4. Thus, a raw score

of 39 correct is the lowest score which can be considered to demonstrate that a candidate did not respond solely by guessing.